IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| DENISE L. MCCLESKY, | ) | Case No. 08 C 50020 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**FILED**

MAY 0 8 2009

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT.

<u>**MEMORANDUM OPINION AND ORDER**</u>

## I.   Introduction

Denise McClesky seeks judicial review of the Social Security Administration

Commissioner's decision to deny her applications for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title

XVI of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3), 1381a. This matter is

before the magistrate judge pursuant to the consent of both parties, filed on July 1, 2008. *See* 28

U.S.C. § 636(c); Fed. R. Civ. P. 73.

## II.   Administrative Proceedings

Claimant applied for DIB and SSI on January 15, 2004, alleging a disability onset date of

June 28, 2003. (Tr. 84–87, 257–59.) The Social Security Administration ("SSA") denied

Claimant's applications initially and upon reconsideration. (Tr. 34, 35.) The Administrative

Law Judge ("ALJ") conducted a hearing into Claimant's application for benefits on December 6,

2005, at which Claimant was represented by counsel and testified. (Tr. 354–82.) Dr. Joseph

Cools, a medical expert, and Cheryl Hoiseth, a vocational expert, also testified at the hearing. (Tr. 382–98.) The ALJ issued a written decision denying Claimant's application on January 26, 2007, finding that jobs existed in significant numbers in the national economy that Claimant could perform. (Tr. 32–33.) Because the Appeals Council denied Claimant's Request for Review regarding the ALJ's opinion, the ALJ's opinion constitutes the final decision of the Commissioner. (Tr. 5–7.)

## III. Background

Claimant was born on November 23, 1961, making her 41 years old at the time of onset. (Tr. 84.) At the time of the hearing, she was 44 years old and lived with her boyfriend. (Tr. 359.) She had no dependant children. (Tr. 85.) She received a GED in 1979 or 1980. (Tr. 375.) She also attended a spring semester of college in 2006, where she took 12 credits and earned a grade point average of 3 or 3.25. (Tr. 375–76.) She testified that she took a couple of classes when she was younger too, bringing her total college credits to around 18. (Tr. 376.) She enrolled again in the fall of 2006, but had to withdraw after the first week because of pain, and because her "books were too heavy, [she] couldn't concentrate, [and she] couldn't read and understand what [she] was reading." (Tr. 376–77.)

Claimant testified that she tried to do some chores every day. (Tr. 380.) Claimant testified that she helps with the cooking, but that she cannot stir a lot or pick up a heavy can of water. (Tr. 367, 381.) She stated that she could flip an egg. (Tr. 381.) Claimant testified that she could help with the dishes, but that she must take ten-minutes breaks because she feels pain and the dishes are heavy. (Tr. 367–68, 380.) Claimant testified that she could sort laundry and make the bed. (Tr. 368.) She testified that she could vacuum for up to five minutes at a time, but

experienced pain in her arm and would have to rest. (Tr. 380.) Claimant stated that her boyfriend does most of the household chores. (Tr. 368.)

Claimant testified that she needed assistance buttoning clothes and fixing her hair because of pain. (Tr. 368.) She also stated that she experienced pain brushing her teeth and showering, and that she might go without showering for up to three days. (Tr. 368.)

Claimant testified that she would turn on the television, but could not sustain concentration for a half-hour long program. (Tr. 368.) She also stated that her concentration problems prevented her from reading a newspaper. (Tr. 368.)

Claimant has been convicted of driving under the influence and, at the time of the hearing, could not drive. (Tr. 377.) She testified that she attended two Alcoholics Anonymous meetings per week, and that she had a sponsor. (Tr. 379.)

Claimant's last significant employment was at Direct Mail Company from September 1987 to October 1998. (Tr. 122, 360.) She held a variety of positions with Direct Mail Company, and performed duties such as answering the telephone, writing orders on order forms, filing, entering data, calculating freight and storage, completing reports, and training new employees. (Tr. 122, 127–29.) After Direct Mail Company, Claimant was a tester at Suitors, a fresh salad company, where she mixed batches of salad and took readings. (Tr. 129, 361.) Between 1999 and 2001, Claimant obtained work through a temp agency. (Tr. 362.) In 2002, Claimant worked as a drive-through cashier at a Wendy's Restaurant. (Tr. 362.) She had to quit because she was not making enough money, and because the job caused her pain. (Tr. 362.) She stated that she could not lift the drink out the window to the customer, and that she experienced neck pain. (Tr. 362.) In 2002, Claimant worked part time for approximately three weeks at a

3

Subway sandwich shop, but had to quit because her hands would fall asleep when she was making sandwiches and she could not wash dishes, which the position required. (Tr. 122, 360.)

## IV.   Medical Evidence

On August 15, 1996, Claimant visited Dr. Terry Roth reporting neck discomfort radiating to the head and ears, with pressure radiating down into the chest and arm. (Tr. 237.) She also reported feeling light headed and dizzy. (Tr. 237.) Dr. Roth noted that Claimant was alert, oriented, and appropriate. (Tr. 237.) Claimant's symptoms were consistent with thoracic outlet syndrome,[1] with symptoms greater on the left side. (Tr. 238.) Dr. Roth recommended Claimant undergo exercises for 30 days. (Tr. 238.)

On November 12, 1996, Claimant saw Dr. Andrew Mitchell at the Mercy Center for Health Care Services, who found evidence of "compression of the left arm [and] of [a] decrease in the profusion of the right arm with a right head as well as at 90 degress." (Tr. 220.) He also found a decrease in the flow in the left artery, and evidence of thoracic outlet compression. (Tr. 220.)

On December 3, 1996, Claimant saw Dr. James Caruso complaining of a chronic condition of neck pain, non-specific chest pain, and arm pain. (Tr. 221.) Dr. Caruso believed the cause of the pains to be from stress fatigue syndrome, but noted that Claimant showed signs of a thoracic outlet syndrome. (Tr. 221.) Dr. Caruso did not believe the thoracic outlet syndrome to be the cause of Claimant's pain. (Tr. 221.)

Dr. Caruso referred Claimant to Dr. Gowher Khan for a rheumotology consultation,

---

[1]Thoracic outlet syndrome is a "collective title for a number of conditions attributed to compromise of blood vessels or nerve fibers (brachial plexus) at any point between the base of the neck and the axilla[.]" *Stedman's Medical Dictionary* 1916 (28th ed. 2006).

which took place on December 5, 1996. (Tr. 239.) At that meeting, Claimant complained of muscle pains and tightness around her neck and arms. (Tr. 239.) She described difficulty lifting her arms and sleeping because of pain in her muscles. (Tr. 239.) Dr. Khan noted that Claimant had been experiencing these pains for "a couple of years." (Tr. 239.) He also noted that carpal tunnel syndrome was ruled out, an EMG did not reveal any cervical nerve involvement, there was no evidence of cervical radiculopathy, an MRI of Claimant's neck was normal, and avascular studies of the upper extremities at Mercy Center in Aurora showed bilateral thoracic outlet syndrome. (Tr. 239.) Dr. Khan also recorded a positive Phalen's test for carpel tunnel syndrome,[2] and found evidence of fibromyalgia.[3] (Tr. 240.) He recommended that Claimant have an angiogram to confirm thoracic outlet syndrome, and that she take Elavil, Flexerial, Extra Strength Tylenol, and Lodine for the fibromyalgia. (Tr. 240.) He also advised that she use a heating pad and have a physical therapy evaluation. (Tr. 240.)

Claimant saw an alcohol and drug counselor, Patrice Keller, at the Ben Gordon Center on December 18, 2001. (Tr. 287.) Ms. Keller wrote in her progress notes that Claimant was having difficulty finding employment because her physical condition prevented her from lifting her arms for any great length of time. (Tr. 287.)

Claimant began seeing Dr. Thomas Dennison for depression at the Ben Gordon Center on January 23, 2002. (Tr. 284.) Dr. Dennison noted her past diagnoses of thoracic outlet syndrome,

---

[2]Carpal tunnel syndrome is "the most common nerve entrapment syndrome, characterized by paresthesias, typically nocturnal, and sometimes sensory loss and wasting in the median nerve distribution in the hand[.]" *Id.* at 1892.

[3]Fibromyalgia is a "common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown." *Id.* at 725.

carpal tunnel syndrome, and fibromyalgia. (Tr. 284.) He ultimately diagnosed Claimant with depressive disorder, not otherwise specified, and history of alcohol dependence. (Tr. 285.) Dr. Dennison started her on Celexa. (Tr. 285.)

Claimant continued meeting with alcohol and drug counselors at the Ben Gordon Center until at least August 16, 2002. (Tr. 300.) On that day, Steven Meehan, a counselor, wrote that he had spoken with Claimant and that she had obtained part time employment. (Tr. 300.)

The Illinois Department of Rehabilitation Services referred Claimant to Dr. Kamlesh Ramchandani for an examination, which took place on March 6, 2004. (Tr. 167–68.) Dr. Ramchandani wrote that Claimant had a dull aching pain, "precipitated on any repetitive activities and on lifting 5–10 pounds." (Tr. 165.) Claimant also complained of having a constant sharp pain in her neck that radiated up, causing headaches and pain in her shoulders. (Tr. 165.) Dr. Ramchandani further noted that Claimant had burning pain in her right shoulder "precipitated on trying to raise the arm above the shoulder level, lifting 5–10 pounds." (Tr. 165.) Dr. Ramchandani wrote that Claimant also had pain in the mid dorsal spine between the shoulder blades, which was caused by "bending, sitting for one hour, standing for 10 minutes, lifting 5–10 pounds, doing dishes, cooking, and cleaning." (Tr. 165.)

Upon physical examination, Dr. Ramchandani noted that Claimant had normal gait, could walk on her heels and toes, could squat and could get up from a squatting position without assistance, could get on and off the examination table without difficulty, and could dress and undress without assistance. (Tr. 166.) She could also grip 4/5 bilaterally, could pick up objects, open and close the door, oppose the thumb to fingers, make a fist and flip pages. (Tr. 166.) Dr. Ramchandani's impressions were the following: (1) fibromyalgia with arthralgia of the cervical

and upper dorsal spine; (2) arthralgia of the right shoulder joint; (3) depression without suicidal ideations; and (4) a history of substance abuse. (Tr. 166.)

On March 10, 2004, Claimant underwent a clinical assessment at the Sinnissippi Centers, Inc., performed by a case manager, Khristy Gridley. (Tr. 156–64.) Claimant sought help for depression, stating that she felt hopeless, helpless, and worthless, and that she suffered low self-esteem, crying, weight loss, lack of appetite, sad feelings, guilty feelings, thoughts of being a failure, irritability, loss of interest, and disturbed sleep. (Tr. 156.) Ms. Gridley noted that Claimant had an alcohol problem, had received at least four driving under the influence convictions, and was receiving treatment at the Ben Gordon Center. (Tr. 156, 159.) Ms. Gridley marked that Claimant had a moderate impairment in her emotional, behavioral, or cognitive condition, and suffered function deficits in the following skills: communication, decision making, family communication, interpersonal, limit setting, use of leisure time, anger management, coping, core mindfulness, distress tolerance, emotional regulation, felling identification, impulse control, relapse prevention, relaxation, sobriety attainment, stress management, and symptom self management. (Tr. 160.) Ultimately, Ms. Gridley diagnosed Claimant with major depressive disorder, recurrent severe, without psychotic features, and alcohol dependance. (Tr. 163.) She also diagnosed Claimant with a personality disorder, not otherwise specified, and noted that Claimant suffered from thoracic outlet syndrome and fibromyalgia. (Tr. 163.) Ms. Gridley recommended that Claimant undergo counseling, physician services, and medication monitoring. (Tr. 164.)

Claimant saw Dr. Daniel O'Meara at the Crusader Clinic in Rockford, Illinois on March 16, 2004 reporting that she had obsessive compulsive disorder, alcoholism, fibromyalgia, and

depression. (Tr. 170.) Claimant also reported having used crack cocaine in the past, and cocaine regularly for at least the past two years. (Tr. 170.) She complained of a sensation of weight on her chest and shoulders, and stated that her arms were too weak to lift a gallon of milk. (Tr. 170.) She also complained of numbness, tingling, aching, and chronic upper back and arm pain. (Tr. 169.) Dr. O'Meara found that Claimant had a full range of motion in her neck and shoulders. (Tr. 170.) He diagnosed her with fibromyalgia, depression, and polysubstance abuse. (Tr. 171.) He advised her to exercise and abstain from drug use, and prescribed her Prozac for the depression. (Tr. 171.)

On March 18, 2004, Claimant saw Dr. Mark Fischer at the Sinnissippi Center for a follow-up. At that time, Claimant reported that she had a depressed mood, emotional lability, decreased energy and motivation levels, and problems sleeping. (Tr. 174.) She reported that she had abstained from alcohol for 42 days. (Tr. 174.) Dr. Fischer noted that Claimant was not on any medications and had not been able to obtain any medical treatment. (Tr. 174.) After meeting with and observing Claimant, Dr. Fischer diagnosed her with major depression, recurrent, and alcohol dependence in recent remission. (Tr. 175.) He gave her a GAF score of 50,[4] and prescribed her Lexapro and Seroquel, both for depression. (Tr. 175.)

Also on March 18, 2004, Claimant received an MRI that had been ordered by Dr.

---

[4]The Global Assessment of Functioning ("GAF") scale is a measure from 1 to 100, with a score of 100 representing superior functioning. *Diagnostic and Statistical Manual of Mental Disorders Text Revision* 34 (4th ed. 2000) (hereinafter "*DSM-IV-TR*"). The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health–illness[,]" and does not "include impairment in functioning due to physical (or environmental) limitations." *Id.*

A GAF score of 50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, [or] frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, [or] unable to keep a job)."

O'Meara. (Tr. 179.) The MRI showed potential atherosclerotic changes of the left internal carotid artery, and possible minimal degenerative disk changes at C5-C6. (Tr. 179.)

On April 8, 2004, Claimant returned to the Crusader Clinic, and Dr. O'Meara noted that she was still experiencing decreased energy, trouble holding her arms up, trouble lifting small items, and shoulder and neck pain. (Tr. 172.) Dr. O'Meara again diagnosed her with fibromyalgia and advised her to exercise and stretch. (Tr. 172.)

On April 10, 2004, a state psychologist, Dr. Carl Hermsmeyer, reviewed Claimant's case and noted that Claimant suffered from an affective disorder resulting from substance abuse. (Tr. 189.) He found that her functional limitations were mild in activities of daily living, moderate in maintaining social functioning, and moderate in maintaining concentration, persistence, or pace. (Tr. 191.) He further found that she had experienced no episodes of decompensation. (Tr. 191.) He ultimately opined that Claimant had the capacity to perform simple tasks. (Tr. 197.)

On April 13, 2004, a state physician, Dr. William Conroy, reviewed Claimant's claim for benefits and concurred that denial was appropriate. (Tr. 180.) He noted that Claimant had full range of motion in all joints, including the spine, that she had no motor, sensory, or reflex deficits, that her gait was normal, that her grip strength was within normal limits, and that her ability to perform fine manipulations was unimpaired. (Tr. 180.) He also noted that she was not taking medicine for any physical impairments. (Tr. 180.)

On April 15, 2004, Claimant visited Dr. Fischer again. (Tr. 176.) She reported "some improvement in mood and an increase in emotional lability over the past two weeks." (Tr. 176.) Dr. Fischer noted that she had stopped taking Seroquel because it was too sedating, but had started taking Elavil about a week prior to this visit. (Tr. 176.) Overall, he found that Claimant

9

was responding well to Lexapro and Elavil, and continued her on those medications. (Tr. 176.)

On June 16, 2004, Claimant began physical therapy at the Rochell Community Hospital. (Tr. 210.) Bridget Johnson, the physical therapist, assessed that Claimant had "decreased cervical range of motion, decreased bilateral shoulder range of motion, decreased grip strength, and decreased upper extremity strength as well as poor posture." (Tr. 208.) Ms. Johnson recommended that Claimant go to physical therapy two to three times per week for four to six weeks, and to do home exercises. (Tr. 209.)

Claimant continued going to physical therapy throughout June. (Tr. 210–12.) By June 30, 2004, Claimant was not feeling upper back pain anymore, but was only feeling "so-so." (Tr. 212.) She required a medical card to continue physical therapy but was unable to obtain one. She cancelled her remaining scheduled sessions without having completed her goals. (Tr. 212.) She also never began her home exercise program as instructed. (Tr. 212.)

Dr. O'Meara referred Claimant to Dr. Linda Li for a nerve conduction and electromyography study report, which she conducted on June 11, 2004. (Tr. 218.) Dr. Li concluded that there was not "evidence of any focal neuropathy, myopathy, peripheral neuropathy or cervical radiculopathy." (Tr. 219.) Dr. Li found that Claimant's "symptoms [were] more likely soft tissue nature pathology such as fibromyalgia." (Tr. 219.)

Claimant returned to Dr. Fischer on July 8, 2004, reporting that her mood had been stable. (Tr. 177.) She still did not have a medical card, though, and she was unable to afford her Elavil medication. (Tr. 177.) Dr. Fischer again diagnosed her with major depression, recurrent, and alcohol dependance in remission. (Tr. 177.) He discussed increasing her Lexapro if her mood changed. (Tr. 177.)

10

At a follow up on August 5, 2004, Claimant again told Dr. Fischer that her mood was stable. (Tr. 178.) She also reported that she was sleeping six to eight hours at night, notwithstanding having stopped taking Elavil. (Tr. 178.) Her diagnosis remained unchanged, and Dr. Fischer continued her on Lexapro. (Tr. 178.)

On November 15, 2004, Claimant visited the Crusader Clinic for a follow up appointment. (Tr. 203.) The clinic confirmed her diagnosis of thoracic outlet syndrome and fibromyalgia. (Tr. 203.)

On November 24, 2004, Claimant saw Ms. Gridley for an individual counseling session. (Tr. 225.) Ms. Gridley noted that Claimant was preparing to begin school in the spring and that she had a normal mood. (Tr. 225–26.) Ms. Gridley wrote that Claimant had stopped taking her medication, and indicated that Claimant may still be using crack or alcohol. (Tr. 226.)

Sinnissippi Centers discharged Claimant on March 24, 2005. (Tr. 222.) Ms. Gridley completed the discharge summary form, noting that the center's services had improved Claimant's functioning. (Tr. 222–23.) Claimant left Sinnissippi with a diagnosis of major depression, recurrent, alcohol dependance, and personality disorder, not otherwise specified. (Tr. 223.) Ms. Gridley also noted that Claimant's GAF score had been 38[5] at admittance, and was 50 at the time of Claimant's discharge. (Tr. 223.)

On October 3, 2005, Claimant visited Dr. Cox-Rodriguez at the Family Health Partnership Clinic in Woodstock, Illinois to obtain a note to get excused from college and to get

---

[5]A GAF score of 38 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at time illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Id.*

reimbursed for tuition paid. (Tr. 216.) Dr. Cox-Rodriguez wrote that Claimant had trouble lifting her arms, but assessed her heart and lungs as normal. (Tr. 216.) Dr. Cox-Rodriguez diagnosed Claimant with fibromyalgia and depression. (Tr. 216.)

On several occasions between May 17, 2006 and June 30, 2006, Claimant visited a chiropractor, Dr. Theodore Paul. (Tr. 247–55.) Dr. Paul initially diagnosed Claimant with segmental dysfunction cervical and cervicobrachial syndrome. (Tr. 247.) He also noted that one leg was shorter than the other. (Tr. 247.) In follow up visits, Dr. Paul wrote that Claimant suffered from thoracic outlet syndrome, and that she had shoulder depression bilaterally, restricted range of motion, and pain in her neck, thoracic, and arms. (*E.g.*, Tr. 349.) Dr. Paul's reports also repeatedly noted taut and tender muscle fibers at the affected spinal areas, as well as muscle asymmetry. (Tr. 249–54.) Dr. Paul also wrote that pain was a 10 out of 10 on a visual analog scale. (Tr. 249–54.)

Dr. Paul wrote a letter, dated July 19, 2006, explaining that Claimant's condition had resulted in debilitating effects on her neck shoulders and arms. He stated that Claimant had "persistent neck and shoulder pain with tingling and dumbness in her arms and hands." (Tr. 256.) The letter also states, "The severity of this condition has kept [Claimant] from pursuing or maintaining meaningful employment." (Tr. 256.)

On November 7, 2006, Claimant visited the Crusader Clinic complaining of elbow-locking and numbness in her hands. (Tr. 279.) She was not on medication at that time. (Tr. 280.) The examiner noted that Claimant had full range of motion bilaterally, and good strength in her extremities. (Tr. 280–81.) The examiner diagnosed Claimant with fibromyalgia and thoracic outlet syndrome. (Tr. 281.)

On November 22, 2006, Claimant returned to the Crusader Clinic and was examined by Dr. John Jaworowicz. (Tr. 282.) Claimant presented with pain in her arms, and numbness and tingling in her hands and fingers. (Tr. 282.) She told Dr. Jaworowicz that she was finding it "more difficult and now impossible" to do her job as a data entry technician. (Tr. 282.)

Dr. Jaworowicz's examination showed that Claimant had an excellent range of motion of her cervical spine, and that her biceps, triceps, and grip strength were excellent. (Tr. 282.) He prescribed her Lyrica, a medication to combat the pain associated with fibromyalgia. (Tr. 282.)

On January 18, 2007, Claimant visited the Ben Gordon Center requesting treatment for depression and chronic pain. (Tr. 312.) On that visit, Claimant was diagnosed with depressive disorder, not otherwise specified, alcohol dependence in sustained full remission, and chronic pain. (Tr. 309–10.) The assessment states that Claimant's "chronic pain and depression [had] led to inability to sustain a job, low energy, difficulty accessing resources, and difficulty completing grooming and household activities." (Tr. 310.)

Claimant saw Dr. Fatima Hadi, a psychiatrist, on March 20, 2007. (Tr. 318.) Dr. Hadi diagnosed Claimant with major depression, recurrent, anxiety disorder, not otherwise specified, and alcohol abuse in remission. (Tr. 317.) She prescribed Claimant Effexor and Trazadone. (Tr. 317.)

Dr. Paul wrote another letter, dated March 23, 2007, regarding Claimant's denial of disability benefits, which was based in part on documents from his office. (Tr. 319.) In this letter, Dr. Paul reiterated that Claimant's condition was degenerative, chronic, and permanent. (Tr. 319.) He stated, "[Claimant's] condition is greatly aggravated by fine movements using the hands. So hers is not just a weight limit issue, but a repetitive limitation." (Tr. 319.)

13

On April 28, 2007, Claimant attended a physical therapy session at the Kishwaukee Community Hospital. (Tr. 323.) She reported that she was experiencing constant pain, which increased with arm activity. (Tr. 323.) She also stated that when she elevated her arms, she experienced numbness. (Tr. 323.) Sheree Pinto, the physical therapist, noted that Claimant had significant pec minor tightness which may have been impinging on her neural tissue. (Tr. 322.) She also noted a positive neurotension sign, and an emotional component associated with her pain symptoms. (Tr. 322.) Claimant attended 11 physical therapy sessions between April 18, 2007 and May 22, 2007. (Tr. 324). Ms. Pinto noted that although Claimant's progress was slow and she still experienced pain, Claimant reported some improvements, an increased ability to perform activities, and decreased symptoms. (Tr. 324.)

At the hearing on December 6, 2005, Dr. Cools testified that Claimant did not meet or equal the requirements for section 12.04 in the listings (affective disorders). Dr. Cools opined that Claimant did not satisfy section 12.04's "B" criteria because she suffered only mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.[6] (Tr. 383.)

He also testified that Claimant did not satisfy the "C" criteria. (Tr. 383.) To satisfy the "C" criteria, Claimant must show following:

> Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
> 1. Repeated episodes of decompensation, each of extended duration; or

---

[6]Activities in daily living, maintaining social functioning, maintaining concentration, persistence, or pace, and episode of decompensation are known as the "B" criteria. 20 C.F.R. 404 pt. 404, subpt. P, app. 1, sec. 12.04.

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. 404 pt. 404, subpt. P, app. 1, sec. 12.04.

After reviewing all the medical evidence and listening to Claimant's testimony, Dr. Cools opined that Claimant's affective disorder was a result of her pain. (Tr. 283.) He did not believe that the affective disorder, standing alone, caused any "substantial limitations in any functional categories." (Tr. 383.) He specified that he "would have" found a limitation in concentration, persistence, or pace based on the report, but that Claimant's success during a semester of college suggested otherwise. (Tr. 383–84.) Under questioning by Claimant's attorney, Dr. Cools also opined that although a GAF score of 50 suggests that Claimant has limitations, it would "not preclude many tasks." (Tr. 385.)

## V.    Standard of Review

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed de novo. *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997). However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner. *Schoenfeld v. Apfel,* 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.").

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI.     Framework for Decision

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3); 1382c(a)(3)(D).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520; 416.920. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments;

16

(4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors. The court will analyze each of these factors to determine whether the Commissioner's decision was supported by substantial evidence.

## VI.    Analysis

### A.    Step One: Is the Claimant Currently Engaged in Substantial Gainful Activity?

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b); 416.920(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. §§ 404.1510; 416.910. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

In this case, the ALJ stated, "The claimant has not engaged in substantial gainful activity since June 28, 2003, the alleged onset date." (Tr. 25.) Neither party disputes this determination. As such, the ALJ's Step One determination is affirmed.

### B.    Step Two: Does the Claimant Suffer From a Severe Impairment?

Step Two requires a determination whether the claimant is suffering from a severe impairment. A severe impairment is any impairment, or combination of impairments, which significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R.

17

§§ 404.1520(c); 416.920(c).[7] The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. §§ 404.1520(c); 416.920(c). If the claimant suffers a severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

In performing the Step Two analysis in this case, the ALJ noted that on or before the onset date, Claimant had the following impairments: fibromyalgia and history of thoracic outlet syndrome. Because these medically determinable conditions significantly limited Claimant's ability to perform basic work activity, the ALJ recognized these impairments as "severe impairments" under 20 C.F.R. §§ 404.1520(c) and 416.920(c). Neither party disputes this determination. As such, the court affirms this part of the ALJ's Step Two determination.

## C.     Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"). The listings describe, for each of the body's major systems, impairments which are considered severe enough per se to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a); 416.925(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled and the inquiry ends; if not, the inquiry moves on to Step Four.

---

[7] The claimant need not specify a single disabling impairment, as the Commissioner will consider combinations of impairments. *See, e.g.*, 20 C.F.R. § 404.1520(c). To simplify, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

In performing the Step Three analysis in this case, the ALJ determined that Claimant's impairment did not meet or medically equal the level of severity contemplated for any impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1. Neither party disputes this determination, and the ALJ's Step Three determination is affirmed.

## D.    Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?

At Step Four, the Commissioner determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about her limitations. *Id.* Although medical opinions bear strongly upon the determination of the RFC, they are not conclusive; the determination is left to the Commissioner who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

When evaluating mental impairments, the Commissioner must use the special technique. 20 C.F.R. §§ 404.1520a, 416.920a. Under the special technique, the Commissioner determines the degree of a claimant's functional limit by rating

> the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) [using] the following five-point scale: None, mild, moderate, marked, and extreme. When [the Commissioner rates] the degree of limitation in the fourth functional area (episodes of decompensation), [the Commissioner uses] the following four point scale: None, one or two, three, four or more.

19

20 C.F.R. §§ 404.1520a(c), 416.920a(c). These determinations are used when assessing the severity of a claimant's impairment and when determining a claimant's RFC. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3); *Burke v. Astrue*, 2009 U.S. App. LEXIS 750, at *5–7 (7th Cir. Jan. 15, 2009).

Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. §§ 404.1565(a), 416.965(a); Social Security Ruling 82-62. If the claimant's RFC allows her to return to past relevant work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work, the inquiry proceeds to Step Five.

In performing the Step Four analysis in this case, the ALJ determined that Claimant's RFC permits all work activities except those that require lifting more than 20 pounds occasionally or 10 pounds frequently, using her arms above shoulder height, and using her hands more than occasionally. (Tr. 28.) This RFC, the ALJ determined, prevents Claimant from performing past relevant work (Tr. 31).

In establishing Claimant's RFC, the ALJ relied in part on Dr. Ramchandani's March 6, 2004 report. In that report, Dr. Ramchandani noted that Claimant was able to dress and undress without assistance, get on and off the examination table without difficultly, displayed near normal grip strength, could pick up objects, could open and close the door, could oppose the thumb to fingers, could make a fist, and could flip pages. (Tr. 28.) Dr. Ramchandani's report also showed normal arm reflexes and sensation. (Tr. 28.) The ALJ also considered Dr. Ramchandani's notations reflecting decreased flexibility in Claimant's shoulders, and a minimal tenderness in Claimant's biceps, forearms, and shoulder joints. (Tr. 28.) Dr. Ramchandani wrote

that Claimant reported a pain when doing repetitive acts, or when lifting 5-10 pounds. (Tr. 165.)

The ALJ also relied on Dr. O'Meara's March and April 2004 findings. (Tr. 29.) At that time, Dr. O'Meara reported full active range of motion in Claimant's shoulders and neck, and found that Claimant displayed normal arm strength. (Tr. 29.) The ALJ also noted that Dr. O'Meara recommended physical therapy, which Claimant did not complete due to lack of insurance. (Tr. 29.)

The ALJ placed some emphasis on Dr. Cox-Rodriguez's October 2005 report, stating that "[n]o abnormal clinical findings were noted" in that report. (Tr. 29.) Dr. Cox-Rodriguez's report did suggest that Claimant was unable to lift her arms, and suffered from depression and fibromyalgia. (Tr. 216.)

The ALJ next noted the report from Claimant's chiropractor, Dr. Paul, which indicated that one of Claimant's legs was slightly shorter than the other. (Tr. 29.) The ALJ also considered the spinal x-ray conducted for Dr. Paul, which showed vertebral-subluxation at multiple levels of Claimant's spine. (Tr. 29.) The ALJ took issue with Dr. Paul's conclusions regarding Claimant's ability to work. (Tr. 31.) The ALJ stated the following:

> On May 17, 2006 Dr. Paul, the chiropractor, wrote that the claimant was unable to maintain meaningful employment due to the severity of her condition. The basis of this opinion is unknown and his failure to include specific limitations is noted. Similarly, on July 19, 2006 Dr. Paul wrote that she should be given all due consideration regarding disability benefits. No weight has been given to these statements.

(Tr. 31.)

In assessing the impact of Claimant's mental impairment on her RFC, the ALJ found that Claimant only had mild functional limitations. (Tr. 27–28.) The ALJ noted that Claimant was diagnosed at the Sinnissippi Center in February 2004 with major depressive disorder, recurrent,

severe, without psychotic feathers, as well as alcohol dependance. (Tr. 26.) The ALJ also noted that Claimant had a GAF score of 38 upon initial treatment, and a GAF score of 50 upon discharge in March 2005. (Tr. 26–27.)

The ALJ relied in part on the reports of Dr. Fischer. (Tr. 27.) On March 18, 2004, Dr. Fischer reported that Claimant had thoughts of suicide, had sleeping problems, and had decreased energy. (Tr. 27.) He gave her a GAF of 50, and prescribed her Celexa, Lexapro, and Seroquel. (Tr. 27.) The ALJ wrote that, with the medication, Claimant "showed significant improvement." (Tr. 27.) Indeed, Dr. Fischer reported that Claimant's mood had improved and remained stable through, at least, August 5, 2004. (Tr. 27, 176–78.) Claimant also reported sleeping six to eight hours per night. (Tr. 178.)

The ALJ relied on Ms. Gridley's November 2004 report. (Tr. 27, 226.) Ms. Gridley wrote that Claimant had a normal mood and planned to attend college even though Claimant had stopped taking medication. (Tr. 225–26.) She also noted that Claimant may still have been using crack or alcohol. (Tr. 226.)

The ALJ gave little weight to the opinion of Dr. Hermsmeyer, a non-examining state doctor. (Tr. 28.) Instead, the ALJ opted to rely on the testimony of Dr. Cools, the medical expert, because he "had the opportunity to listen to the claimant's testimony, question the claimant, and to review additional medical records submitted after [Dr. Hermsmeyer] had reviewed the file." (Tr. 28.) Dr. Cools found that Claimant's ability to complete a semester of college with good grades suggested only mild limitations in concentration, persistence, and pace. (Tr. 27.) The ALJ also relied on Dr. Cools' testimony that Claimant's depression was linked to Claimant's pain, and that medicating for the pain seemed to stabilize Claimant's depression. (Tr.

27.) Dr. Cools testified that although Claimant's GAF score of 50 indicated moderate limitations, the remainder of the evidence, including Claimant's college performance, suggested only mild limitations. (Tr. 27.)

The ALJ also found that Claimant had only mild social limitations. (Tr. 31.) The ALJ based this finding on evidence that Claimant had lived with family members in the past, and lived with her boyfriend at the time of the hearing. (Tr. 31.)

The ALJ found that, although the above medical evidence supported a finding of Claimant's impairment, Claimant's statements concerning the intensity, persistence, and limiting effects of the impairment were not credible. (Tr. 29.) From the record, the ALJ cited several pieces of evidence that called into question Claimant's credibility.

First, the ALJ stated that although it "[was] apparent that claimant [was] distressed, it [was] notable she [had] not always pursued things that would elevate [sic] that distress."[8] (Tr. 30.) As support, the ALJ noted that Claimant had only one doctor visit, on October 3, 2005, in over two years' time. (Tr. 30.) The ALJ further noted that Claimant failed to consistently take medication. (Tr. 30.) Claimant blamed her lack of medical attention and inconsistency in medication administration on her financial situation. (Tr. 30.) The ALJ doubted Claimant's excuse, and pointed to a statement Claimant made to Dr. Roth in March 2002 claiming that she did not like to take her medication.[9] (Tr. 30.) The ALJ also cited to Claimant's unwillingness to

---

[8]Considering the context, this sentence should probably read, "it is notable she has not always pursued things that would *alleviate* that distress."

[9]The ALJ cites to Exhibit 13F for Claimant's March 2002 statement. Exhibit 13F is not indexed, and the court cannot find it in the record. It does not seem to be among Dr. Roth's 1996 records either, when he initially diagnosed Claimant with thoracic outlet syndrome. Whether or not this statement is included in the record is inapposite; there exists other evidence that

complete physical therapy, or to do home exercises (which are free). (Tr. 30.) The ALJ further pointed to Dr. Cox-Rodriguez's October 2005 report, which states that Claimant had a bottle of Lexapro at home which she had not started taking. (Tr. 30.) Also, Ms. Gridley, Claimant's counselor, reported that Claimant was noncompliant with her medications in November 2004.

At the hearing, Claimant testified that, although she had taken Lexapro in the past, she was not then taking any prescription medications. (Tr. 373.) Also, Claimant testified that she did not regularly take over-the-counter pain medication because she did not want to develop stomach problems, and that she only took medicine when the pain got "real bad." (Tr. 374.)

The ALJ also found inconsistencies in Claimant's testimony about her work history. According to the ALJ, Claimant "told various doctors she quit working for Wendy's fast food restaurant, even though she was only working part time, because it was too much for her." (Tr. 30.) The ALJ found Claimant's testimony at the hearing inconsistent, stating, "[C]laimant testified she stopped working at Wendy's as she could not live on what she was earning." (Tr. 30.) The ALJ found support for the latter statement in that Claimant began a clerical job shortly after quitting Wendy's.

The ALJ also found a discrepancy in Claimant's testimony regarding her past drug use. (Tr. 30.) Claimant testified that the last time she used illegal drugs was in 1982 or 1983. (Tr. 378.) But, as the ALJ pointed out, she told doctors that she had used drugs more recently than that. (*E.g.*, Tr. 170.)

Ultimately, the ALJ found the following regarding Claimant's physical impairment:

[C]laimant's highly sporadic medical treatment, non-compliance with taking

---

Claimant did not follow medication plans.

medications as prescribed, failure to do the exercises which have been beneficial to her, and lack of candor about her substance abuse, decrease[d] the credibility of her statements. There is no basis, particularly in view of her improving clinical picture, to suggest that she is more limited or that she could not use her hands on an occasional basis. The thoracic outlet syndrome would be responsible for the weakness she experiences, which is related to having her hands elevated. Thus, even though from a clinical viewpoint she has improved, the restriction on reaching overhead is adequate.

(Tr. 30.)

The ALJ's understanding of the medical evidence is slightly incorrect. Dr. Cox-Rodriguez did not mark the boxes that would indicate abnormalities of the head, ears, eyes, nose, throat, neck, thyroid, breasts, abdomen, urogential, or extremities. Because Dr. Cox-Rodriguez did not mark the "abnormal" boxes, the ALJ assumed that Dr. Cox-Rodriguez assessed those body parts as normal. But, Dr. Cox-Rodriguez also did not mark the "normal" boxes. (Tr. 216.) Because Dr. Cox-Rodriguez did not mark either box, the evidence does not support the conclusion that Dr. Cox-Rodriguez found those body parts either normal or abnormal.

The ALJ's findings regarding Dr. Paul's reports and letter are also incorrect. The ALJ wrote that Dr. Paul's May 17, 2006 report indicated that Claimant was "unable to maintain meaningful employment due to her condition[,]" but it was actually Dr. Paul's July 19, 2006 letter that used that language. (Tr. 256.) Aside from this inaccuracy, the ALJ was correct in noting that Dr. Paul did not link his statement to any specific medical evidence. Thus, the ALJ did not err in giving that statement no weight.

The ALJ's evaluation of Claimant's credibility is also slightly incorrect. The ALJ's statement that Claimant had only seen a doctor once in over two years is exaggerated, even assuming the ALJ was only counting medical visits for physical symptoms. Claimant attended physical therapy in June 2004 (Tr. 209–12), saw Dr. O'Meara on June 11, 2004 for a nerve

25

conduction and electromyography study report (Tr. 219), visited the Crusader Clinic on November 15, 2004 (Tr. 203), visited her chiropractor between May 2006 and June 30, 2006 (Tr. 247–56), and visited the Crusader Clinic through November 2007 (Tr. 282). There does not seem to be a two year window where Claimant visited the doctor only once. Regarding Claimant's inconsistent medicine administration, the court notes that on November 22, 2006, Dr. Jaworowicz prescribed Claimant Lyrica, and in March 2007, Dr. Hadi prescribed Claimant Effexor and Trazadone. (Tr. 282, 317.) There is no evidence that Claimant did not take these medications as prescribed.

Also, the inconsistency noted by the ALJ regarding Claimant's work history is slightly inaccurate. The ALJ noted that Claimant told her doctors that she quit Wendy's because "it was too much for her," but then testified at the hearing that she left so that she could get more hours. (Tr. 30.) However, the ALJ ignored the next few lines of Claimant's testimony, in which she stated that although she tried to work extra hours at Wendy's, "it got to the point where [she] couldn't . . . lift the pop out the window to the customers and [her] neck . . . got kinked and [she] couldn't turn." (Tr. 362.) This testimony tends to support the statements she made to the doctors.

Although the ALJ's recount of the facts is slightly inaccurate, the ALJ's inaccuracies are not fatal to her determination. The objective medical evidence in the record, including reports by Dr. Ramchandani, Dr. O'Meara, Dr. Paul, and Dr. Cox-Rodriguez, supports the conclusion that Claimant could not lift more than 20 pounds occasionally or 10 pounds frequently, could not use her arms above shoulder height, and could not use her hands more than occasionally. (Tr. 28.) Indeed, in March 2006, Dr. Ramchandani wrote that Claimant reported pain upon lifting more

than five to ten pounds. (Tr. 165.) The ALJ thoroughly considered the reports of the doctors, and drew a logical bridge between the evidence in those reports to her RFC determination.

Also, the ALJ did not err in her assessment of Claimant's mental impairment. The ALJ considered the reports of Dr. Fischer, Ms. Gridley, and Dr. Cools. Those reports suggest that Claimant, especially when on medication, suffers mild limitations across the three functional areas. There is also no evidence in the record suggesting repeated episodes of decompensation. The ALJ considered the reports of Claimant's doctors and counselors, and drew a logical bridge from those reports to her finding that Claimant had only mild limitations across the three functional areas.

Regarding both her physical and mental limitations, the ALJ identified enough inconsistencies in the record to cast a legitimate doubt upon Claimant's statements concerning the intensity, persistence, and limiting effects of the impairment. The court affirms the ALJ's RFC determination.

The ALJ adopted the opinion of the vocational expert, Ms. Hoiseth, that Claimant could not perform any past relevant work. Neither party disputes this determination, and the court affirms the ALJ's Step Four determination.

**E.    Step Five: Does Any Other Work Exist in Significant Numbers in the National Economy Which Accommodates the Claimant's Residual Functional Capacity and Vocational Factors?**

At step five, the Commissioner determines whether the claimant's RFC and vocational factors allow the claimant to perform any job which exists in the national economy in significant numbers. 20 C.F.R. § 404.1560(c). The burden is on the Commissioner to provide evidence that demonstrates that other work exists. 20 C.F.R. § 404.1560(c)(2). In determining whether other

27

work exists, the Commissioner considers the claimant's RFC and vocational factors in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, app. 2 (the "Guidelines"). The Guidelines direct a conclusion of "disabled" or "not disabled" upon a finding of a specific vocational profile. Soc. Sec. Rul. 83-11. The Guidelines represent exertional maximums, though, and if the claimant cannot perform substantially all of the exertional demands contemplated by the Guidelines, a conclusion cannot be directed without first considering the additional exertional limitations. Soc. Sec. Rul. 83-11 & 83-12. A vocational expert's testimony, if it is reliable, can satisfy the Commissioner's burden of determining whether a significant number of jobs exist in the economy. *Overman v. Astrue*, 546 F.3d 456, 2008 U.S. App. LEXIS 21016, at *18 (7th Cir. 2008).

Because Claimant's exertional capacity was limited below the level contemplated by the Guidelines, the ALJ relied on a vocational expert. (Tr. 32.) The vocational expert in this case found that a person with Claimant's RFC and vocational history could perform the requirements of the occupation of surveillance system monitor (1,000 jobs) and telemarketer (13,000 jobs). (Tr. 32, 391–92.) The ALJ relied on the vocational expert's finding, and determined that a finding of "not disabled" was appropriate. (Tr. 71.) The court affirms the ALJ's decision.

## V.     Conclusion

For the forgoing reasons, the Commissioner's motion for summary judgment is granted and Claimant's motion for summary judgment is denied.


**E N T E R:**

P. MICHAEL MAHONEY, MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT

DATE: 5/8/09